# EXHIBIT A

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
02/05/2024 at 05:02:25 PM
By: Damaree Franklin,
Deputy Clerk

1  PATRICK R. DELAHUNTY (CA Bar No. 257439)
   pdelahunty@delawllp.com
2  WILLIAM J. EDELMAN (CA Bar No. 285177)
   wedelman@delawllp.com
3  DELAHUNTY & EDELMAN LLP
   4 Embarcadero Center, Suite 1400
4  San Francisco, CA 94111
   Tel:    (415) 891-6210
5  Fax:    (415) 891-6256

6  BILLIE D. WENTER (CA Bar No. 235193)
   bwenter@boyerwenter.com
7  BOYER WENTER LLP
   1585 North 4th St., Suite N
8  San Jose, CA 95112
   (669) 296-0327
9
10 *Attorneys for Plaintiff LeRonne Armstrong*

11                  SUPERIOR COURT OF CALIFORNIA

12                      COUNTY OF ALAMEDA

13                      UNLIMITED JURISDICTION

14

15 LERONNE ARMSTRONG, an individual,      CASE NO.  24CV062749

16         Plaintiff,                     **COMPLAINT FOR DAMAGES:**

17     v.                                 (1) Retaliation in violation of California Labor
                                              Code § 1102.5
18 THE CITY OF OAKLAND, CALIFORNIA, a     (2) Retaliation in violation of First Amendment,
   public corporation; SHENG THAO, an         42 U.S.C. § 1983
19 individual,
                                          **DEMAND FOR JURY TRIAL**
20
           Defendants.
21

22

23

24

25

26

27

28

Plaintiff, LeRonne Armstrong ("Plaintiff" or "Chief Armstrong"), by and through his counsel of record, for his Complaint against Defendants, the City of Oakland, California ("Oakland" or "the City"), and Mayor Sheng Thao ("Mayor Thao"), alleges as follows:

<u>**SUMMARY OF ACTION**</u>

1.      The City illegally terminated Plaintiff as Chief of the Oakland Police Department ("OPD)" in retaliation for Chief Armstrong having the courage to speak out about misconduct by the federal monitor overseeing OPD.

2.      For approximately 20 years, OPD has been subject to supervision and control by a federal court-appointed monitor in connection with a 2003 settlement of a class-action lawsuit alleging civil rights violations by OPD. Under this arrangement, the City and its taxpayers pay the monitor and his team substantial sums – roughly one million dollars annually (now totaling nearly $20 million) – purportedly to evaluate OPD's progress in complying with policies, procedures, and laws intended to strengthen the City's ability to decrease instances of police misconduct. Under Chief Armstrong, OPD made substantial progress on its nearly 20-year-old monitoring and was on track to regain full independence in mid-2023.

3.      Despite good intentions of monitoring generally, the practical financial realities of a monitorship incentivize the monitor to continue to find "systemic problems" and "leadership failures" because the monitor personally benefits by requiring further supervision under the monitor's well-compensated gaze.

4.      In Oakland, Robert Warshaw has long served as the federal monitor. Warshaw's job is to oversee the successful implementation of reforms at OPD. Curiously, according to Warshaw himself, – he has failed for over a dozen years. Oakland has had more than ten individuals serve in the role of police chief since 2013. Yet somehow, Warshaw has managed to play both sides of the fence by continuously claiming that OPD needs more change – under his watch – while escaping serious scrutiny for his own complete, self-professed failure.

5.      In reality, courageous, reform-minded OPD Chiefs put their reputations and careers on the line to do the right thing and change the culture of OPD – and they succeeded. Unfortunately, the monitorship leaders – since 2014, Robert Warshaw – unfairly discredited and minimized the former

CASE NO.                                                                                                    COMPLAINT

Chiefs' efforts because Warshaw stood to personally benefit by finding fault at the top of OPD. As long as Warshaw opines that OPD has leadership problems, Warshaw can argue his continued supervision – at great expense to Oakland and its taxpayers – remains necessary.

6.      Chief Armstrong is the latest example of this well-documented pattern. Chief Armstrong is a native of West Oakland who spent his entire career with OPD. As he rose through the ranks, Chief Armstrong established a strong record of implementing reforms and demonstrating a commitment to progressive policing that prioritizes accountability. Chief Armstrong was appointed as Chief in February 2021, and he promptly made good on his reputation as an effective reformer by bringing OPD to the brink of ending federal oversight altogether through compliance with the monitorship requirements.

7.      With OPD nearing the finish line, Warshaw announced he had discovered another serious problem with OPD leadership stretching to the Chief. Warshaw required Oakland to commission an outside law firm to investigate and issue reports on the handling of two internal affairs investigations. The reports were issued in early 2023 and documented misconduct by one subject officer (a Sergeant), as well as intentional misconduct by another officer (a Captain) who, according to the reports, tried to cover up and minimize his Sergeant friend's misconduct.

8.      Warshaw and his team transformed routine instances of lower-level misconduct into a complete indictment of OPD and Chief Armstrong. Warshaw's reports were nothing less than a hatchet job on Chief Armstrong; Warshaw went to great lengths to insist Chief Armstrong was personally responsible and not candid in his statements to investigators. Media reports based on the evidence, as well as an administrative appeal with a reportedly favorable outcome, confirmed the reports' criticisms of Chief Armstrong were baseless. Chief Armstrong never engaged in wrongdoing, and the reports' suggestion otherwise had no basis in facts, logic, or department policy.

9.      Nevertheless, Warshaw issued the reports. Faced with inaccurate criticisms of his integrity and performance and threats to his career, Chief Armstrong had the courage to identify the elephant in the room. In a series of direct reports to the Mayor and public statements, Chief Armstrong defended his actions on the merits and called out Warshaw's misconduct. Chief Armstrong explained

CASE NO.                                                                                      COMPLAINT

1   that this was merely the latest example of Warshaw intentionally leveling false and unfair criticisms at

2   OPD leadership to justify Warshaw's own position and continued lucrative monitorship.

3       10.    At the time Warshaw issued his reports, Oakland had a brand-new Mayor (Thao) who

4   was intimidated by Warshaw and who bowed to his pressure instead of standing up for Oakland.  Mayor

5   Thao placed Chief Armstrong on paid leave and then quickly terminated him before the Police

6   Commission, the media, and the public had time to assess the accuracy of Warshaw's outside law firm's

7   criticisms of Armstrong.  Remarkably, after retaliating against Armstrong by terminating him, Mayor

8   Thao admitted her decision to terminate Chief Armstrong was retaliatory in nature.

9       11.    Mayor Thao stated that she terminated Chief Armstrong not because of his performance

10  or problems with the way Chief Armstrong handled the incidents under investigation, but because Chief

11  Armstrong spoke out and criticized Warshaw.  In sum, the Mayor is on record numerous times

12  explaining that she fired Chief Armstrong because Chief Armstrong pointed out that Warshaw's

13  criticisms of the Chief were factually baseless and were the latest instance of Warshaw destabilizing

14  OPD leadership for Warshaw's personal benefit.

15      12.    This is an unusual wrongful termination case.  The City's sole decision-maker (Mayor

16  Thao) has repeatedly and publicly explained her reasons for the unlawful termination – and those

17  reasons are illegal and retaliatory on their face.  The City and its agents violated the California Labor

18  Code and Chief Armstrong's federal constitutional rights.

19                                        **PARTIES**

20      13.    Chief Armstrong is a resident and citizen of Oakland, Alameda County, California.  He

21  worked for OPD for over twenty years and rose through the ranks from patrol officer to Chief.  He was

22  sworn in as Chief in February 2021.

23      14.    The City is a public municipal corporation and a California Charter City located within

24  Alameda County, California.

25      15.    Mayor Thao is an individual.  On information and belief, she is a resident and citizen of

26  Oakland, Alameda County, California.  She was the Mayor of Oakland during Chief Armstrong's tenure

27  as Chief, and she was the Oakland city official responsible for the decision to terminate Chief

28  Armstrong as Chief of OPD as well as the decision not to re-hire Chief Armstrong.

CASE NO.                                                                    COMPLAINT

**JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION**

16.    Jurisdiction is proper in the Superior Court for the County of Alameda because it has general subject matter jurisdiction and no statutory exceptions to jurisdiction exist.

17.    The Court has personal jurisdiction over Oakland because it is a California municipal corporation organized under a charter adopted pursuant to the Constitution of the State of California.

18.    Venue is proper in this Court because this is an action against a city, and the City is in Alameda County.  California Code of Civil Procedure § 394(a).

19.    Chief Armstrong has exhausted his administrative remedies.  On July 17, 2023, Chief Armstrong timely filed a tort claim with the City.  His claim included all required elements under Government Code § 910, including the Chief's name and post office address; the post office address for notices related to the claim; the date, place, and other circumstances of the occurrence that gave rise to his claim; a general description of the City's indebtedness and the Chief's injury; the names of the City employees who caused the Chief's injury; and the fact that the Chief's injuries exceed the jurisdictional minimum for an unlimited civil case under the laws of the State.  On August 29, 2023, the City denied his claims.  On February 22, 2023, Chief Armstrong also timely administratively appealed his termination and discipline.  Chief Armstrong's appeal concluded on September 7, 2023.

**FACTUAL ALLEGATIONS**

**Chief Armstrong's Background and Success as a Reformer Chief**

20.    A native of West Oakland, Chief Armstrong worked for OPD as a sworn officer for over twenty years. Chief Armstrong started as a patrol officer and had a distinguished career, leading to consistent promotions culminating in his appointment as Chief in February 2021.

21.    The Chief worked hard to earn that position and the trust of the community, bringing impressive credentials and leadership training to the role.  For example, he holds a bachelor's degree in criminal justice and a master's in organizational leadership.  He has attended several highly selective, well-regarded police leadership training programs, including the Police Executive Research Forum (P.E.R.F.) Senior Management Institute for Police Executives, California POST Leadership School, and the FBI National Academy.  After assuming the role of Chief in 2021, Chief Armstrong brought his unique background as an African-American and native of Oakland to the significant challenges facing

- 4 -

1  OPD.

2      22.    In particular, Chief Armstrong built a reputation and track record as an effective internal

3  reformer who was committed to improving the professionalism and effectiveness of the Department

4  through cultural and institutional change.  For example, Chief Armstrong led OPD's Stop-Data

5  Collection Project, which has been recognized nationally for OPD's implementation of strategies that

6  have reduced the number of OPD traffic stops by 60% and stops of African Americans by over 50%.

7      23.    Similarly, Chief Armstrong served as the department's liaison to the Stanford University

8  police-reform SPARQ (Social Psychological Answers to Real-world Questions) Program, which

9  involved a team of experts analyzing Department data and conducting qualitative research to determine

10  if specific reforms could improve police-community relations.  Chief Armstrong led the implementation

11  of all 50 recommendations resulting from the research.

12  **Federal Monitorship of OPD**

13      24.    The Chief's background as a reformer was key because at the time Chief Armstrong

14  became Chief – and to this day – OPD has long operated under the supervision of a federal judge and a

15  federally court-appointed monitor.  The monitorship stemmed from a 2003 settlement of a federal civil

16  rights lawsuit alleging systemic police misconduct at OPD (the *Allen* case, sometimes referred to as the

17  "Oakland Riders" case).  The monitorship was intended to ensure the successful implementation of

18  reforms at OPD to avoid the problems that led to the *Allen* case.

19      25.    The federal *Allen* lawsuit resulted in a Negotiated Settlement Agreement and later an

20  Amended Memorandum of Understanding (AMOU) (collectively, "NSA") that specifies approximately

21  52 "Tasks" for federal oversight.

22      26.    The NSA Tasks cover nearly every aspect of policing, including the internal affairs

23  process, integrity tests, use of force, academy and field training, supervision, detentions/arrests,

24  community policing, and consistency of discipline.  Most tasks have numerous requirements OPD must

25  implement and maintain.  The Monitor reviews and reports on compliance with each Task and makes a

26  finding of "in compliance," "out of compliance," or "partial compliance" in regular reports to the federal

27  court handling the *Allen* case.

28

CASE NO.                                                                                            COMPLAINT

27.    Warshaw was appointed as the Monitor and has served in that role since 2010. Since 2014, Warshaw has also held the dual role of Compliance Director, a job previously held by two different people.

28.    Warshaw's dual role is problematic because the Monitor and Compliance Director positions originated as two separate positions intended to serve different purposes. The Compliance Director is supposed to assist OPD with implementing reforms while working in concert with OPD to achieve common goals. The Monitor is in place to examine whether OPD has met its goals. Warshaw entirely abandoned his Compliance Director role, which involves actually assisting OPD and accepting responsibility for implementing reforms. On information and belief, Warshaw has not actually visited Oakland as part of his duties for five years despite receiving pay as the "Compliance Director." Warshaw sits back; he does not assist with reforms and instead unpredictably commissions reports critical of OPD and targeting its leadership.

29.    Oakland – and ultimately taxpayers – pay Monitor Warshaw and his team for their work overseeing OPD. While detailed breakdowns are not publicly available, news reports have estimated that Warshaw and his team are paid over a million dollars per year for their work.[1] As of 2020, Oakland has paid $17.8 million in "monitor/compliance fees, related costs, and subject matter experts."[2]

**Prior Complaints About Monitor Warshaw**

30.    Monitor Warshaw's lengthy tenure in Oakland has been marked by complaints from prior Oakland Police Chiefs and other senior OPD leaders; Warshaw has unfairly criticized Oakland police leadership and acted in ways to extend his own lucrative monitorship role.

31.    For example, Chief Armstrong's predecessor, Chief Kirkpatrick ("Kirkpatrick"), publicly stated that "[t]he only reason the police department is 'out of compliance' [with the NSA] is not because of its officers, policies or procedures. It is because Warshaw wants to keep milking Oakland for

---

[1] *E.g.*, https://www.cbsnews.com/sanfrancisco/news/former-oakland-police-chief-renews-criticism-of-federal-monitor/.

[2] https://www.sfchronicle.com/crime/article/Ouster-of-Oakland-chief-inflames-tensions-over-15101813.php.

CASE NO.                                                                                            COMPLAINT

money."[3]

32.     Former Chief Whent, who was Chief from 2014 to 2016, likewise criticized Monitor Warshaw, stating that Warshaw provided no clear guidance on what was needed to bring OPD into full "compliance" with the NSA.  Whent described a dinner with Warshaw in 2015 where Whent expressed feeling "ethically challenged" in his role assisting with the monitorship oversight because he felt "complicit in, basically, a fraud."  *Id.*

33.     Former OPD Captain Ersie Joyner, who retired in 2019, also worked with Monitor Warshaw on OPD's compliance and had similar complaints.  Captain Joyner stated that "Warshaw, for whatever reason, has treated the city of Oakland as his personal annuity."  Joyner noted that Warshaw's approach led to never-ending oversight, observing: "There's a saying, that if you're teaching a class and five people fail, they didn't study. If 20 people fail, you didn't teach."

34.     Former OPD Chief Howard Jordan, who retired in 2013, also criticized Monitor Warshaw, stating in 2020 that Warshaw should be fired and that his work for Oakland amounts to "the fox guarding the henhouse."[4]

35.     In addition, Oakland is not the only community and law enforcement agency to complain about Monitor Warshaw.  Warshaw also serves as the federal monitor overseeing the Maricopa County Sheriff's Office in Arizona.  In connection with a community meeting Warshaw held in October 2023, then-Maricopa County Sheriff Penzone criticized Warshaw as preventing the department from operating effectively, and a community member questioned Warshaw's financial incentives and salary.[5]  Others have questioned the utility and cost-effectiveness of Warshaw's earlier similar work in New York.[6]

---

[3] https://www.sfchronicle.com/crime/article/Ouster-of-Oakland-chief-inflames-tensions-over-15101813.php.

[4] https://www.ktvu.com/news/2-former-opd-chiefs-city-councilman-criticize-federal-oversight-of-police-lawsuit-pending.

[5] https://www.phoenixnewtimes.com/news/maricopa-county-sheriffs-office-ignoring-racial-profiling-residents-say-17406766.

[6] https://niagarafallsreporter.com/Stories/2013/Jul23/rochester.html.

CASE NO.                                                                                                    COMPLAINT

**Monitor Warshaw's Pattern of Problematic Criticisms of OPD Leadership**

36.     Monitor Warshaw has a pattern of harshly and baselessly accusing OPD leadership of failing to hold its officers accountable and failing to promote a culture of accountability.  Two incidents in particular are noteworthy.

37.     First, in 2019, Warshaw reviewed the internal affairs decisions linked to a 2018 incident where OPD officers shot and killed a 31-year-old homeless, mentally ill man, Joshua Pawlik. Kirkpatrick determined that none of the officers involved should be terminated, and she downgraded some of the discipline her subordinates recommended.  Warshaw overrode Kirkpatrick's decisions.

38.     In a memo documenting his decision, Warshaw criticized Kirkpatrick, calling her decision "disappointing and myopic"; he concluded, "I reject the chief's principal conclusions in this matter."[7]  Warshaw criticized the internal investigation as not placing proper weight on certain video evidence and accused the investigators of using leading questions to justify the shooting.  *Id.*  As a result of Warshaw's decision to override Kirkpatrick's decision, the City terminated five OPD officers in connection with the Pawlik case.

39.     Warshaw's conclusions in the Pawlik case cost Oakland and its taxpayers.  The five terminated officers appealed their terminations and ultimately prevailed, resulting in a recommendation that all five officers be reinstated with back pay.[8]  In addition, then-Mayor Schaaf later terminated Kirkpatrick as OPD Chief after she fell out of favor with the Commission at least in part due to the Commission accepting Warshaw's unfounded conclusion Kirkpatrick mishandled the investigation.[9] Kirkpatrick later sued Oakland for unlawful termination and ultimately prevailed, resulting in Oakland paying approximately $1.5 million settlement to Kirkpatrick.[10]

40.     In 2021, Warshaw again coordinated an independent investigation (using the same outside law firm that later wrote negative reports about Chief Armstrong) into an OPD Internal Affairs

---

[7] https://www.kqed.org/news/11731203/federal-monitor-calls-opd-chiefs-take-on-shooting-disappointing-wants-stiffer-discipline.

[8] https://www.sfchronicle.com/eastbay/article/Judge-says-Oakland-improperly-fired-five-officers-17078849.php.

[9] https://www.sfchronicle.com/crime/article/Ex-Oakland-police-chief-Anne-Kirkpatrick-fires-15081085.php.

[10] https://www.kron4.com/news/former-oakland-police-chief-to-receive-1-5-million-settlement/.

CASE NO.                                                                                    COMPLAINT

Division (IAD) investigation related to an Instagram page.  The Instagram page contained offensive (e.g., sexist, racist, anti-police-reform, and otherwise inappropriate) law-enforcement related memes. An OPD officer invited to "follow" the page brought it to the OPD's intelligence unit's attention, which resulted in a department-wide email to all sworn officers that noted the Instagram page could be a plot to gain police "followers" and obtain sensitive information about officers or the department.  The email also warned, "[s]omething as simple as following an account that is questionable or spouts negative rhetoric could reflect poorly on you."

41.    The outside law firm concluded that the person who created the Instagram page was not an active OPD officer; rather, the creator was a former OPD officer who had been terminated.  On information and belief, the investigation did not reveal any active OPD officers responsible for posting any of the content on the page.  Nevertheless, Warshaw's commissioned report leveled scathing criticisms of OPD, its leadership, and its "culture."

42.    The harsh condemnations in the report included: "[t]he issues surfaced by this investigation go beyond the conduct of individual officers to the culture of the Department at large;" "[t]his failure occurred at every level of OPD;" " [t]he failure of anyone at OPD to flag these memes, or to recognize the extent to which they undermined years of efforts to comply with the NSA, suggests that the views expressed by the memes remain alarmingly widespread;" and the "Instagram page has rocked the Oakland Police Department on many levels.  OPD's anemic response to the page bespeaks the need for a culture shift aided by robust anti-discrimination and social media policies."  This rhetoric caught the attention of the federal Judge overseeing the NSA and was cited as a reason for concern that OPD may not be ready to advance toward ending the monitorship, and OPD needed to show efforts to address its culture.[11]

43.    This massive (and expensive) Instagram investigation by an outside law firm at Monitor Warshaw's direction involved six months of work, forty-three witness interviews, and a review of data from over 140 OPD-issued cell phones.  The investigation generated two detailed reports, one of which is publicly available, and is 23-pages.

---

[11] https://oaklandside.org/2022/01/06/federal-judge-opd-instagram-case-spotlighted-a-number-of-troubling-problems/.

CASE NO.                                                                                                COMPLAINT

44. Yet, like the Pawlik case, the aftermath of the harsh criticisms Warshaw endorsed revealed he was wrong. On information and belief, OPD disciplined nine officers in connection with the investigation, resulting in suspensions ranging from three to twenty-five days. The highest-ranking disciplined officer was a lieutenant – far below senior leadership level – and most of the discipline had nothing to do with the Instagram page in question. Rather, IAD investigators discovered several unrelated policy violations while looking into the Instagram issue. Not a single officer was terminated and less than one percent of OPD officers were disciplined. In sum, Warshaw's alarmist conclusions about sweeping deficiencies with OPD leadership and culture were wrong, and the costly investigation neither uncovered policy violations by OPD leaders nor any "widespread" problem.

## Chief Armstrong's Termination

### The Chief is Placed on Leave

45. The events that culminated in Chief Armstrong's termination relate to Chief Armstrong's status as Chief during two IAD (i.e., internal affairs) investigations involving the same OPD officer.

46. Before those events, Chief Armstrong led OPD to the closest it came to ending federal oversight. Chief Armstrong led OPD into a phase of federal oversight known as "sustainability." Sustainability is essentially a probationary period where the department has demonstrated that it has reached compliance and can continue to succeed. It is the last phase of oversight before ending monitorship. OPD had never reached that phase under any prior OPD Chief. Under Chief Armstrong, the sustainability period—and, thus, federal oversight—were scheduled to terminate in May 2023.

47. Until facing the end of his lucrative monitorship, Warshaw complimented Chief Armstrong for implementing successful reforms. As the federal monitor, Warshaw was responsible for filing quarterly reports with the federal court stating his opinion of OPD's progress under the NSA. In an April 2022 quarterly report, Warshaw heaped praise on Chief Armstrong, stating: "Chief Armstrong and the leadership of the Department are to be commended for their tenacity and commitment to ensuring that the Tasks in the Negotiated Settlement Agreement, which constitute modern, progressive policing, have been met."

48. Warshaw's tone abruptly changed as the monitorship neared an end. Warshaw again retained an outside law firm to investigate OPD, and Warshaw presented the reports from that

- 10 -

investigation to the federal judge in the *Allen* case as part of the Court's ongoing review of OPD's compliance with the NSA.

49.     On January 18, 2023, the federal judge presiding over the *Allen* case ordered the public release of a summary report the outside law firm prepared (the "Summary Report").  The Summary Report purported to provide an overview of findings and conclusions concerning Warshaw's and the law firm's investigation into whether OPD mishandled two internal investigations.

50.     The Summary Report referenced three underlying confidential reports prepared by the same law firm that authored the Summary Report, which contained findings and conclusions related to three IAD investigations.  Warshaw signed as "approved" each confidential report.

51.     The first investigation, IAD Case No. 22-0858, involved a suspected hit-and-run incident in San Francisco involving OPD Sgt. Michael Chung while Chung was off-duty.  The second investigation, IAD Case No. 22-0443, involved a suspected unreported discharge of a firearm in an OPD elevator by Chung.  The third investigation, IAD No. 22-1723, examined the OPD's process in responding to the first two incidents.

52.     The outside law firm's reports made separate findings regarding Chief Armstrong's role and purported responsibility for policy violations in the first (hit-and-run, No. 22-0858) and third (overall IAD investigation, No. 22-1723) investigations.  Chief Armstrong was not a "witness" or "subject officer" in the second report (No. 22-0443) involving the elevator discharge incident.  In other words, investigators understood that Chief Armstrong had been "walled off" by Warshaw from supervising the elevator discharge investigation, and given Armstrong's lack of participation in and responsibility for that investigation, investigators had no reason to assess whether Armstrong violated any policies.

53.     The Summary Report referenced conclusions in the underlying confidential report that the Chief violated two policies—"gross dereliction of duty" and "performance of duty"—by purportedly failing to properly supervise the hit-and-run investigation (No. 22-0858).  The investigators did not conclude that Chief Armstrong violated any policy in connection with the other two reports (No. 22-0443 and No. 22-1723).

CASE NO.                                                                                        COMPLAINT

54.     Two of the confidential reports (hit-and-run, No. 22-0858, and overall IAD investigation, No. 22-1723) additionally contained conclusions from the outside law firm that Chief Armstrong's statements to investigators during the investigations lacked credibility.  Yet, Chief Armstrong was never accused in any of the reports of violating the OPD policy requiring truthfulness during IAD investigations.

55.     Mayor Thao received the Summary Report and the reports regarding the hit-and-run (No. 22-0858) and elevator incidents (No. 22-0443) no later than January 18, 2023.  On January 19, 2023, the Mayor had a telephone conversation with Chief Armstrong and City Administrator Reiskin regarding Chief Armstrong potentially taking a mandated administrative leave.

56.     During that conversation, Chief Armstrong told the Mayor that he understood why the Mayor would have concerns based on the Monitor's Summary Report, but he urged the Mayor to withhold judgment until seeing the underlying evidence and individual reports because Chief Armstrong was confident the Mayor would agree that the Monitor's conclusions were unreasonable once she knew the facts.  Chief Armstrong further explained to the Mayor that neither he nor his conduct was the real problem; it was the Monitor who made invalid and self-serving criticisms of the Chief to benefit the Monitor.  The Mayor responded that the Monitor made clear she needed to place Chief Armstrong on leave because if she did not, the Monitor would step in to do it, and that would look worse for the City.

57.     The Mayor placed Chief Armstrong on administrative leave later the same day as her telephone conversation with Chief Armstrong and Reiskin (January 19, 2023), and the Mayor publicly announced the same on that date.

<u>The Chief Responds to Being Placed on Leave</u>

58.     On January 23, 2023, Chief Armstrong responded to the Mayor's decision to put him on administrative leave.  Chief Armstrong asked the Mayor to reinstate him immediately; he made public statements directed to the Mayor and asked the Mayor for immediate action.  The media reported on Chief Armstrong's statements.

59.     As reflected in Mayor Thao's later comments quoting and referring to Chief Armstrong's January 23 statements, the Mayor was aware that Chief Armstrong directed his statements to her and, accordingly, considered his statements in deciding how to respond to Warshaw's reports.

60.     Mayor Thao's understanding that Chief Armstrong's January 23 statements were directed to her is reflected by her behavior shortly before Chief Armstrong's statements.  The Mayor met with Chief Armstrong's Chief of Staff a few hours before Chief Armstrong was scheduled to make his statements.  The Mayor wanted to discuss the substance of Chief Armstrong's looming statements.  The Mayor told Chief Armstrong's Chief of Staff that she understood the Chief was going to criticize Warshaw publicly.  The Mayor asked the Chief to refrain from singling out the Mayor for criticism because the Mayor was optimistic that the Chief and the Mayor could reach a common understanding and keep the Chief in his position.

61.     During Chief Armstrong's widely reported and recorded January 23 statements, Chief Armstrong openly criticized Warshaw.  The Chief issued a statement accusing the federal monitor of acting "in the interest of his own pocketbook by manufacturing a false crisis to justify extending his lucrative monitoring contract."  Further, Chief Armstrong stated that (i) the Monitor's conclusions were plainly inconsistent with the truth and the reports' own recitation of the facts, (ii) the Monitor had a financial motivation to levy such unfair criticisms to extend Oakland's federal oversight and thus his monitorship, and (iii) the report was "a last ditch effort to destroy the credibility of me, destroy the credibility of this department, and to make the community believe that, again, OPD is involved in some shady business – and that's not what this is."

62.     Further, Chief Armstrong stated:

a.      He deserved to be reinstated because he had done nothing wrong.  He followed "all policies, protocols and procedures in the two incidents" referred to in the reports.  The findings in the reports are not supported by evidence.

b.      He had a proven track record of holding people accountable.  As Chief of Police for the past two years, he brought the Department into almost full compliance [with the NSA]. The Department was only five months away from exiting federal oversight.  This was not a systemic problem.  The Department had changed; it has the ability to investigate itself.  That did not, however, make it immune from misconduct.  Police officers are human and will make mistakes.

c. His decision [regarding the vehicle incident] was based on the information that his investigators and staff brought to him. He cannot read all of the hundreds of reports that are sent to him, or he would not have time to do his job as Chief. That is why he has a chain of command; the Commanders in charge review the reports, and the Chief decides based on all evidence presented to him at Friday meetings. The Chief expects the Commanders to provide all evidence because it would otherwise be unfair to the officer under investigation and the community.

d. The IAD (i.e., internal investigation) process has been in place for several years, and the federal monitor has never stated there were any problems with it. The Chief agrees that, based on some of the recommendations in the Reports, the Department could tighten the investigative structure and ensure higher-level reviews within OPD. But, he is concerned that Reports such as this "pull at the credibility of the Department" and ignore all of the work that has been done to come into compliance. It misleads the community into believing this is the "same old Oakland Police Department" they have experienced over the last two decades and "that's not who we are."

63. In sum, Chief Armstrong's January 23 statements reiterated his commitment to reforms and accountability at OPD and expressly acknowledged the existence of problems at OPD, including problems identified in the outside law firm's investigation. Chief Armstrong reiterated his track record of and ongoing commitment to leading the effort to address those problems through continued reform and accountability: "I think I have a proven track record of holding people accountable. As the Chief of Police in Oakland for the last two years we've gotten eight Tasks into full compliance." The Chief noted the Monitor's prior conclusions of sustained progress under Chief Armstrong's leadership and noted further, "[T]hat's the question do we have a willingness to hold ourselves accountable and I believe I have demonstrated that I am willing to hold people accountable and have held people accountable." Further, the Chief noted if subordinate officers intentionally covered-up information related to the hit-and-run investigation before the investigation reached the Chief, that would be misconduct that needed to be addressed.

CASE NO.                                                                                                    COMPLAINT

64.     In addition, on February 7, 2023, Chief Armstrong (via his counsel) sent a letter to the Mayor, copying the Police Commission, explaining in detail why the conclusions that the Chief violated policies and lacked credibility in connection with the hit-and-run investigation were wrong.

65.     Chief Armstrong's letter explained:

a.      the report's conclusion that Chief Armstrong's statements were not credible were based on six predicate conclusions, but each of the six predicate conclusions were either contradicted by the report's own factual conclusions or the content of the audio-recorded statements;

b.      the report faulted the Chief for supposedly misstating the reporting structure in the department, for "declining" to show a video of the suspected hit-and-run incident at a disciplinary decision-making meeting, and for "shutting down" questioning at that meeting, but none of those conclusions had factual support;

c.      the report's suggestion that the Chief committed misconduct was, to say the least, puzzling in light of the Monitoring team's active participation (without raising objections) in the incidents the report concluded amounted to misconduct; and

d.      the report's analysis of specific Manual of Rules ("MOR") policy violations was fundamentally flawed because it argued that a heading of the MOR that set forth no actual rule was violated, it referenced a "gross dereliction of duty" MOR that does not apply in substance and conspicuously failed to cite the actual (inapplicable) "gross dereliction of duty" MOR, and it accused the Chief of failing to perform his duties without specifying which duties were at issue (Letter at 9-10).

66.     The specific criticisms in the letter did not identify gray areas of judgment where reasonable people could disagree.  Rather, it highlighted that the conclusions completely lacked factual support and made no sense.  The letter concluded that it was clear Chief Armstrong committed no misconduct and was credible, and he should be reinstated immediately.

67.     The Mayor's office never responded in substance to Chief Armstrong's February 7, 2023 letter.  To date, the Mayor's office has never offered a substantive rebuttal to the points in Chief

- 15 -

Armstrong's letter and has not defended the outside law firm's criticisms of Chief Armstrong as substantively reasonable.

68.      Chief Armstrong was not provided with a copy of the third outside law firm report regarding OPD's investigation of the elevator incident (IAD No. 22-1723) until after he sent his letter to the Mayor and the Police Commission on February 7, 2023.

69.      The third report's conclusion that Chief Armstrong lacked credibility was also unpersuasive, inconsistent with the underlying evidence and made no sense.  The report's authors acknowledged that the Chief was "walled off" from this investigation relatively early when the Monitor shifted it to outside investigators.  The Chief's role in the investigation was extremely limited, which is why the report could not and did not conclude that Chief Armstrong violated any policies in connection with an investigation that he was instructed not to run.

70.      Yet, for unclear reasons, the report's authors devoted significant effort to attacking the Chief's credibility even after concluding he committed no misconduct.  The report generally offered a few sentences or a paragraph about each witness's credibility but inexplicably devoted a full page to the Chief's credibility.  The report's theory on this point was inherently self-contradictory.  The authors criticized the Chief for "minimizing" his knowledge of the investigation, even though he was ordered to do exactly that when he was "walled off."  The report also omits a statement Chief Armstrong made to investigators that he informed the Monitor he was still receiving high-level information about the investigation – an omission that completely undercuts the report's theory that Chief Armstrong was downplaying to investigators the fact he still received information about the investigation after being walled off.

71.      The transparently flimsy and illogical nature of the report's findings and conclusions that critically criticized the Chief were outlined not only by Chief Armstrong himself in his letter and public statements but also by the media when it subsequently had a chance to review the reports and evidence in detail.[12]

---

[12] *E.g.*, https://www.mercurynews.com/2023/04/01/borensteinoakland-police-chief-was-unfairly-fired-confidential-reports-show/.

CASE NO.                                                                                                    COMPLAINT

The Community Swiftly Backs Chief Armstrong

72.    Reflecting the significant reservoir of trust and goodwill Chief Armstrong built with the community through his leadership and accomplishments, community leaders rallied around the Chief after the Mayor placed the Chief on leave and called for the Chief's reinstatement.

73.    Numerous groups publicly criticized the Mayor for hastily placing Chief Armstrong on leave and called for his immediate reinstatement.[13]  Local media extensively covered the public demonstrations for Chief Armstrong, and at the demonstrations, Chief Armstrong continued to speak out publicly about Warshaw's conduct.  As an example, Chief Armstrong suggested Warshaw's false criticisms were so unfounded and unfair they must be intentionally false.[14]

The Police Commission Acts to Address Chief Armstrong's Status

74.    The Oakland Police Commission has the responsibility under Oakland law to formally evaluate the Oakland Police Chief's performance and the authority to terminate the Chief for cause.

75.    On February 9, 2023, after receiving Chief Armstrong's letter, the Police Commission noticed a special meeting of its Discipline Committee to assess the Chief's status on leave and whether any discipline or termination was appropriate based on the existing reports.  The meeting was scheduled for February 15, 2023, at 8:00 p.m. PT.

The Mayor Terminates Chief Armstrong Before the Commission Can Act

76.    On February 15, 2023, at 4:00 p.m. PT, the Mayor held a press conference hours before the Police Commission was scheduled to hold its own meeting to discuss the Chief's status on leave. The Mayor announced that she decided to terminate Chief Armstrong.

77.    Fifteen minutes before the press conference, the City notified Chief Armstrong that he was going to be (i) disciplined and (ii) terminated.  Specifically, the City notified Chief Armstrong that he was being disciplined with a 30-day suspension for "gross dereliction of duty" and "performance of duty" – the two violations referenced in the outside law firm's hit-and-run report (IAD Case No. 22-

---

[13] *E.g.*, https://oaklandside.org/2023/01/24/chief-leronne-armstrong-large-downtown-rally-naacp/ (noting the presence of the Oakland NAACP, faith leaders, 100 Black Men of the Bay Area, Oakland Chinatown Chamber of Commerce, and others).

[14] *E.g.*, https://www.ktvu.com/news/naacp-rallies-behind-oakland-police-chief-placed-on-administrative-leave.

0858).  The City also notified Chief Armstrong he was simultaneously being terminated "without

cause."  The Mayor signed the termination notice.

78.     During her press conference, the Mayor made clear she was terminating Chief Armstrong

because he criticized Warshaw. The Mayor's explanation revealed that she decided to terminate Chief

Armstrong due to his statements that Warshaw unfairly criticized the Chief because Warshaw stood to

personally benefit from extended oversight resulting from instability in senior OPD leadership.

79.     The Mayor stated her opinion that OPD needed to "welcome opportunities for

improvement rather that immediately rejecting criticism," and she elaborated further, "Armstrong made

a number of statements that troubled me."[15] Without any reference to or discussion of underlying facts

and details of the relevant investigations, the Mayor criticized and faulted Chief Armstrong for

disagreeing with Warshaw's conclusions.  Indeed, the Mayor openly declined to offer any factual

justification based on the details of the reports or the Chief's refutation of the reports and instead merely

opined that her review of the reports revealed "systemic" problems at OPD.

80.     The Mayor also characterized Chief Armstrong's public statements as reflecting a lack of

commitment to accountability and reform at OPD.   She suggested that Chief Armstrong's statements

minimized misconduct that occurred by officers below the Chief and rejected any notion of systemic

problems.

81.     The Mayor explained that she based her decision on Warshaw's negative conclusions

about the Chief, and she was unwilling to employ a Police Chief who disagreed with the Monitor: "We

must be confident that our Chief will be effective in making sustainable improvements that can be

recognized by the federal monitor, the federal court, and the people of Oakland."  Erasing all doubt, the

Mayor continued: "It's an absolute requirement, that my administration, including the Chief of Police,

be able to work closely with the Monitoring team . . ."

82.     The Mayor has separately stated on at least three other occasions that she terminated

Chief Armstrong because she felt pressure from Warshaw to get rid of a Chief who had criticized him.

First, as already noted, the Mayor told Chief Armstrong directly in a phone call just before placing the

---

[15] A video of the Mayor's remarks is available at https://www.youtube.com/watch?v=W5nP35DmsDA.

Chief on leave that the Mayor concluded she had to place him on leave because the Monitor told the Mayor if she did not do so the Monitor would and that would look bad for the City.

83.    Second, immediately after the Mayor's February 15, 2023 press conference announcing the Chief's termination, the Mayor openly stated to a group that she felt the Monitor forced her to terminate the Chief.  After the conference concluded, the Mayor left the press room and entered a private caucus room where a small group of city staff were gathered.  The Mayor then openly expressed her frustration with the Monitor.  At least five people were present (besides the Mayor) when the Mayor made these statements.  While the exact details of witnesses' recollections vary slightly, in sum and substance, the Mayor stated in an angry tone: "F—k the Monitor for making me do this.  I really didn't want to do this."

84.    Third, at a neighborhood association event in approximately April 2023 where the Mayor answered questions during a panel discussion, including a question about the Mayor's decision to terminate Chief Armstrong, the Mayor conveyed that the Monitor pressured her to terminate the Chief.

The Police Commission and the Community Respond to the Chief's Termination

85.    On February 15, 2023, after the Mayor fired Chief Armstrong, the Police Commission met and issued its own statement responding to the Mayor's rushed termination decision.  The Commission noted the Mayor's decision to preempt the Commission's process and issued a "heartfelt farewell to Chief Armstrong."

86.    The Commission further stated that (i) Chief Armstrong had led the Department through an incredibly challenging pandemic with a huge surge in violent crime (ii) brought OPD into compliance with 51 out of 52 of the NSA Tasks; (iii) brought OPD into Sustainability after 20 years of federal oversight; and (iii) "crafted one of the most, if not the most diverse leadership team in the country."

87.    The Commission additionally flagged the "[t]he questionable quality, sufficiency, and credibility of the outside investigations" the Mayor relied on in deciding to terminate the Chief.

CASE NO.                                                                                                    COMPLAINT

88.     Community leaders and groups again rallied in support of Chief Armstrong and against his termination.  The media covered the public demonstrations.[16]

89.     Notably, one of the plaintiffs' attorneys (John Burris) in the *Allen* case who sued to reform OPD in the first place has publicly supported Chief Armstrong.  As plaintiffs' counsel in the *Allen* case, Mr. Burris is responsible for weighing in on the progress of OPD toward reforms in the federal court case during quarterly updates.  In responses to questions about whether Mayor Thao's termination of Chief Armstrong was appropriate, Burris stated, "The chief did nothing wrong here.  And that's the point that I was arguing at the very outset, is that the investigative report reached by the lawyers and the investigators really jumped to conclusions and made assertions, made assumptions, that when you analyzed the report, the facts did not support it." Burris has also noted that Chief Armstrong's firing slowed OPD's efforts to get out from under federal oversight.  "This [firing] became a major stumbling block and set us back," he said, adding that if Chief Armstrong is not reinstated, it could send a message that any police chief can be fired without due process or cause, which could harm future hiring efforts.[17]

<u>The Chief's Administrative Appeal</u>

90.     The Chief exercised his right to administratively appeal his discipline and termination.

91.     Under the City's administrative appeal process for Police Chiefs, the appeal involves a hearing before a neutral Hearing Officer resulting in a report issued by the Hearing Officer making findings and non-binding recommendations to the City.  The Hearing Officer does not have the authority to change the City's decision about discipline or termination and can only make recommendations to the City.

92.     A retired California Court of Appeal Justice serving as a neutral hearing officer presided over Chief Armstrong's hearing and, on September 7, 2023, issued a 55-page Report and

---

[16] *See, e.g.*, https://abc7news.com/oakland-police-chief-leronne-armstrong-fired-naacp-rally-reinstate-mayor-sheng-thao/12850236/; https://www.postnewsgroup.com/community-leaders-respond-to-the-firing-of-chief-leronne-armstrong-mayor-sheng-thao-is-wrong/.

[17] https://www.kqed.org/news/11961636/report-recommends-oakland-mayor-consider-reinstating-former-police-chief-leronne-armstrong.

CASE NO.                                                                                              COMPLAINT

Recommendation. Under the City's stated Administrative Appeal procedures, that report is supposedly confidential.

93.     Several media outlets, however, reported they had been able to review a copy of the Hearing Officer's report. Those media outlets reported:

      a.     the Hearing Officer recommended that the discipline against Chief Armstrong be reversed because the outside law firm's reports the City relied on in concluding the Chief violated policies were not backed by evidence, and the conclusions relied on speculation and poor reasoning;

      b.     the Hearing Officer concluded that Chief Armstrong may have a plausible First Amendment claim arising out of his termination;

      c.     the Hearing Officer recommended the Chief and the City sit down and discuss a potential resolution, including the possibility of reinstatement.[18]

94.     Chief Armstrong approached the City about discussing a potential resolution shortly after the Hearing Officer issued the report. Despite the Hearing Officer's recommendation about having such discussions, the City never agreed to discuss resolution. To date, the City has not reversed Chief Armstrong's 30-day suspension based on the supposed policy violations the Hearing Officer reportedly found baseless.

<u>The Mayor Doubles Down on her Retaliation and Refuses to Consider Re-Hiring Chief Armstrong</u>

95.     After the media widely reported on the Hearing Officer's conclusions, Mayor Thao stated she would not consider re-hiring the Chief. The Mayor distanced herself from the discredited conclusions in the outside law firm's reports and instead insisted that she decided to terminate the Chief based on Chief Armstrong's statements after he learned about the leave, regardless of any alleged wrongdoing that led to Warshaw's investigation.

---

[18] *E.g.*, https://www.sfchronicle.com/eastbay/article/oakland-police-chief-arbitrator-18373820.php; https://oaklandside.org/2023/09/19/arbitrator-report-fired-oakland-police-chief-leronne-armstrong/; https://www.kqed.org/news/11961636/report-recommends-oakland-mayor-consider-reinstating-former-police-chief-leronne-armstrong.

CASE NO.                                                                                          COMPLAINT

96.    Under Oakland law, the selection of a new Police Chief requires that the Police Commission present a list of candidates to the Mayor for consideration.  After Mayor Thao fired Chief Armstrong, the Police Commission began the process of vetting candidates to be presented to the Chief.

97.    After the Hearing Officer's report was provided to the Police Commission, the Commission announced that it would place on its agenda whether Chief Armstrong should be considered as finalist for Mayor Thao's consideration since it appeared that Chief Armstrong should not have been fired in the first place.[19]

98.    The Police Commission vetted Chief Armstrong as a potential candidate.  In October 2023, the media reported that Chief Armstrong made the Police Commission's shortlist of potential candidates for the new permanent Police Chief and asked the Mayor to comment.  The Mayor publicly threatened additional retaliation against Chief Armstrong stating she would not re-hire Chief Armstrong because the Chief criticized the Monitor.

99.    The Mayor explained that she was "determined to get us out of federal oversight" and "the next police chief is going to have to be able to work with the monitor and with the federal judge as well."  She said that the Chief "will not be LeRonne Armstrong in this case" because the Mayor did "not have the belief that he can lead this city out through that process."[20]

100.    Ultimately, the Police Commission included Chief Armstrong on a list of three candidates presented to Mayor Thao in December 2023 as options for a new permanent Oakland Police Chief.

101.    Mayor Thao made good on her threat to retaliate against Armstrong again.  She did so by rejecting all three candidates later the same month and instead asked for a new slate of candidates.

**First Cause of Action: Retaliation In Violation of First Amendment, 42 U.S.C. § 1983**

**(Against Oakland and Sheng Thao)**

102.    Chief Armstrong repeats and incorporates each of the prior allegations in this Complaint set forth above.

---

[19] https://cao-94612.s3.amazonaws.com/documents/Press-Statement-9.18.23.pdf.

[20] https://abc7news.com/oakland-mayor-sheng-thao-leronne-armstrong-opd-chief-public-safety/13935386/.

CASE NO.                                                                                                    COMPLAINT

103.    Chief Armstrong's public statements constituted protected speech that substantially addressed matters of public concern.  Chief Armstrong's statements concerned the Monitor's self-serving wrongdoing, malfeasance, and violations of law, which the City, through the Mayor, ratified. Chief Armstrong's speech bore directly on critical issues of government mismanagement at the policy level involving an essential public safety agency, and the Mayor's blind deference to a Monitor that has failed for over a dozen years, abused a vulnerable system to his advantage, and cost Oakland taxpayers millions while doing so.  Chief Armstrong's speech did not address mere employment grievances.

104.    Chief Armstrong's public statements were not made in the ordinary course of his job duties, which involved managing OPD's day-to-day operations.  The statements were made while Chief Armstrong was on administrative leave.  Chief Armstrong's speech was made in his capacity as a concerned citizen and involved reports that were necessary to reveal self-dealing, corrupt acts, and conduct fundamentally contrary to the purposes of the monitorship, which is designed to enhance community trust and increase transparency through *fair and thorough* assessments of OPD's compliance with the law.  Chief Armstrong directed his protected speech to the only city personnel capable of standing up to Warshaw's misconduct and demanding that Oakland's oversight be fair and backed by evidence and reasonable judgment.

105.    Chief Armstrong's protected speech, made in his capacity as a private citizen and which substantially addressed matters of public concern, was a substantial motivating factor in the City's adverse employment actions, including the City's termination of the Chief's employment in direct retaliation for his whistleblowing activities and the failure to rehire Chief Armstrong.

106.    Thao and the City had no adequate justification for terminating the Chief's employment based on his protected whistleblowing speech under *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968).  Chief Armstrong's protected speech did not disrupt the City's ability to control its work environment or the relationships between coworkers within OPD, and it did not impair his ability to perform his job duties or obstruct OPD's routine operations.  Chief Armstrong's speech was aimed at protecting OPD's integrity and the ability of its personnel to continue operating effectively.

CASE NO.                                                                                                          COMPLAINT

107.    Chief Armstrong's protected speech was the logical and proximate cause of his termination, and the protected speech was a substantial and motivating factor for his termination. Indeed, the City and its sole decision-maker, the Mayor, have explained the retaliatory basis for Chief Armstrong's termination.

108.    In terminating Armstrong, Mayor Thao acted on the City's behalf and as its agent, and she is a City official responsible for establishing final policy for Oakland in terminating a police chief, as evidenced by Chief Armstrong's letter of appointment expressly stating that the Mayor had authority to terminate him "at any time," California Government Code Section 3304(c), and Oakland City Charter Article IV, Section 604(b)(1).  As such, Mayor Thao's termination of Chief Armstrong was the decision of a final policymaker of Oakland for purposes of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

109.    Mayor Thao and the City's wrongful conduct was a substantial factor in causing Chief Armstrong harm, including worry, anxiety, mental anguish, emotional and physical distress, and humiliation; lost compensation, retirement, and fringe benefits; damage to Chief Armstrong's reputation, and loss of future income.

110.    The acts of Thao were malicious and in conscious disregard for, or with deliberate indifference to, the rights of Chief Armstrong as set forth above.  Thao's decision to terminate Chief Armstrong was predicated on a refusal to employ or rehire any Chief that publicly criticized Monitor Warshaw regardless of the merits of the criticisms against Warshaw and regardless of the merits of Warshaw's criticisms of the Chief.  Mayor Thao intentionally terminated Chief Armstrong after learning of myriad flaws and inaccurate statements in the reports. She deliberately short-circuited the process of revealing the truth that the reports' criticisms had no merit., She disregarded the baseless nature of the allegations and the Chief's rights in deciding to terminate the Chief and refusing to rehire him even after he had the support of the community, the Police Commission, and the administrative appeal hearing officer.  Chief Armstrong is therefore entitled to an award of punitive damages against Mayor Thao.

**<u>Second Cause of Action: Retaliation in Violation of Labor Code § 1102.5</u>**

**<u>(Against Oakland)</u>**

111.   Chief Armstrong repeats and incorporates repeats and incorporates Paragraphs 1-101 in this Complaint set forth above.

112.   At all relevant times, Labor Code § 1102.5 was in effect and binding on the City.  This statute prohibits an employer from retaliating against an employee for raising complaints of actual or potential illegality for providing information of such actual or potential illegality because the employee is believed to have engaged in such conduct or because the employee may engage in such conduct.

113.   At all relevant times, the City was Chief Armstrong's employer, and Chief Armstrong was an employee under the Labor Code.

114.   Chief Armstrong disclosed information he reasonably believed violated the law by raising concerns directly to the Mayor in a private conversation that the Monitor's conclusions were unfounded and unreasonable, and the Monitor made invalid and self-serving criticisms about the Chief to benefit himself personally.  Chief Armstrong expressed his concern to the Mayor that she would prematurely judge Chief Armstrong without seeing the underlying evidence or individual reports and make a rash disciplinary decision based on unfounded accusations.  The City, through the Mayor, retaliated against Chief Armstrong and placed him on leave.  Chief Armstrong continued to disclose information he reasonably believed violated the law by a) issuing public statements that the Monitor acted "in the interest of his own pocketbook by manufacturing a false crisis to justify extending his lucrative monitoring contract", and the Monitor was financially motivated to levy unfair criticisms against Chief Armstrong to extend his monitorship, and b) sending a letter to the Mayor, copying the Police Commission, that explained in detail the reasons Warshaw unfairly and falsely criticized him and the conclusions in Warshaw's report lacked credibility.  On February 15, 2023, less than a month after Chief Armstrong's disclosures, the City, again through the Mayor, retaliated against him by hastily terminating his employment.

115.   In sum, Chief Armstrong raised complaints of actual and/or potential illegality, including but not limited to complaints about violations of California Penal Code § 68(a); 18 U.S.C. §§ 201, 1341, 1343, and 1346; Oakland Municipal Code § 2.25.06; and Oakland Municipal Code § 2.24.100 while

CASE NO.                                                                                                     COMPLAINT

working for the City, and the City retaliated against him by taking adverse employment actions, including placement on leave, termination, and the failure to rehire him notwithstanding the Police Commission's support and revelations that the criticisms of Armstrong's performance had no merit.

116. Chief Armstrong's disclosure of Warshaw's self-dealing and fraud in serving as the Monitor for his own financial benefit and to the detriment of the City and its taxpayers was a contributing factor in the City's decision to place Chief Armstrong on leave, discharge him, and fail to rehire him.

117. The City's wrongful conduct was a substantial factor in causing Chief Armstrong harm, including worry, anxiety, mental anguish, emotional and physical distress, and humiliation; lost compensation, retirement and fringe benefits; damage to Chief Armstrong's reputation, and loss of future income.

118. Chief Armstrong has incurred and will continue to incur legal expenses and attorneys' fees, and he is entitled to recover attorneys' fees and costs (including expert costs) under Labor Code § 1102.5(j) in an amount according to proof.

119. Chief Armstrong seeks reinstatement to the position of Chief of Police for OPD.

120. On July 17, 2023, Chief Armstrong timely filed a tort claim with the City and included all required elements under Government Code § 910.

## **PRAYER FOR RELIEF**

Wherefore, Chief Armstrong prays that the Court award judgment against Oakland as follows:

1. For an award of economic damages in an amount to be determined at trial;
2. For injunctive relief under Labor Code § 1102.5, including Chief Armstrong's reinstatement to Chief of Police for OPD;
3. For punitive damages against Thao in an amount to be determined according to proof;
4. For an award of emotional distress damages in an amount to be determined at trial;
5. For an award providing recovery of attorneys' fees and costs of suit incurred in connection with this action;
6. For an award of prejudgment interest;
7. For an award of post-judgment interest for the maximum amount allowed by law;
8. For an award of costs; and

CASE NO.                                                                                          COMPLAINT

9.      For such further and just relief as this Court deems proper.

## **JURY DEMAND**

Chief Armstrong demands a jury trial of all causes of action asserted herein so triable.

Respectfully submitted,

DATED: February 5, 2024                    DELAHUNTY & EDELMAN LLP
                                           BOYER WENTER LLP


                                           */s/ William J. Edelman*
                                           WILLIAM J. EDELMAN
                                           BILLIE D. WENTER
                                           Attorneys for Plaintiff

- 27 -