UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LERONNE ARMSTRONG,<br><br>    Plaintiff,<br><br>    v.<br><br>THE CITY OF OAKLAND, CALIFORNIA, et al.,<br><br>    Defendants. | Case No. 24-cv-01953-TLT<br>Alameda County Docket: 24CV062749<br><br>**ORDER GRANTING MOTION TO DISMISS AND REMANDING ACTION TO STATE COURT**<br><br>Re: Dkt. No. 13 |

    Defendants City of Oakland and the City of Oakland Mayor Sheng Thao (collectively, "Defendants") move to dismiss Plaintiff LeRonne Armstrong's ("Armstrong") complaint. ECF 13 ("Mot."). On February 5, 2024, Armstrong, the former Chief of the Oakland Police Department ("OPD"), filed a complaint alleging (1) 42 U.S.C. Section 1983 claim for retaliation in violation of the First Amendment against both Defendants and (2) retaliation in violation of California Labor Court Section 1102.5 against the City of Oakland. ECF 1-1 ("Compl.").

    For over twenty years, OPD has been subject to the oversight of an independent Federal Monitor appointed by the Federal Court. The oversight arises from a Negotiated Settlement Agreement ("NSA"), which the City of Oakland entered in 2003 in the case of *Allen et al. v. City of Oakland et al*, 3:00-cv-4599-WHO (N.D. Cal.) (popularly referred to as the "Riders" case). On January 23, 2023, Armstrong made statements alerting the public that he believed that the Federal Monitor engaged in fraudulent misconduct. The underlying dispute in this case concerns whether Armstrong's First Amendment rights were violated when his employment was terminated by Mayor Thao after Armstrong made his public statements.

    The outcome of the First Amendment claim largely hinges on whether Armstrong, as the Police Chief, was a "policymaker" who could be terminated for political reasons by Mayor Thao

without violating Armstrong's First Amendment rights. This policymaker exception established by the Supreme Court is the function of a representative democracy—elected officials must be permitted to make personnel decisions that further the platform under which they were elected. After review and consideration of the motions, oral arguments, relevant legal authority, briefings, attachments thereto, the Court **GRANTS** with prejudice Defendants' motion to dismiss Armstrong's First Amendment claim. After review of the supplemental briefings, the Court **REMANDS** Armstrong's remaining state-based claim for lack of subject matter jurisdiction.

## I. BACKGROUND

### A. Procedural Background

On February 5, 2024, Armstrong filed his Complaint in the County of Alameda Superior Court of California. Compl. at 1. Armstrong alleged (1) 42 U.S.C. Section 1983 claim for retaliation in violation of the First Amendment against Defendants City of Oakland and the City of Oakland Mayor Sheng Thao, and (2) retaliation in violation of California Labor Court Section 1102.5 against Defendant City of Oakland. *Id.* ¶¶ 102-120. On March 29, 2024, the action was removed to this Federal Court. ECF 1.

On May 3, 2024, Defendants filed a motion to dismiss all claims. Mot. In conjunction with the motion to dismiss, Defendants also request judicial notice of several exhibits. ECF 13-1 (Defs.' RJN). Subsequently, Armstrong filed an opposition with an accompanying request for judicial notice. ECF 16 ("Opp'n"), 16-1 ("Pl.'s RJN"). Defendants filed a reply. ECF 17 ("Reply"). Oral argument on the motion was heard on October 15, 2024. The Court permitted parties to submit supplemental briefing on the issue of whether the state-based claim should be remanded to state court. *See* ECF 39, 40.

### B. Factual Background

Plaintiff LeRonne Armstrong was the Chief of the Oakland Police Department ("OPD") from February 2021 until February 2023. Compl. ¶¶ 6, 76–77. Before he became Chief, Armstrong spent over twenty years at OPD as a sworn officer. *Id.* ¶ 20. As part of his position, Armstrong was charged with leading the OPD in complying with and ending its federal oversight. *Id.* ¶ 47.

2

For over twenty years, OPD has been subject to the oversight of an independent Federal Monitor appointed by the Federal Court. *Id.* ¶ 24. The oversight arises from a Negotiated Settlement Agreement ("NSA"), which the City of Oakland entered in 2003 in the case of *Allen et al. v. City of Oakland et al*, 3:00-cv-4599-WHO (N.D. Cal.) (popularly referred to as the "Riders" case). *Id.* ¶ 25. The NSA requires the OPD to comply with 52 tasks, covering nearly every aspect of policing. *Id.* ¶¶ 25-26.

The Federal Monitor is charged with oversight of the NSA to ensure that OPD complies with the NSA. *Id.* ¶ 26. In 2010, Robert S. Warshaw was appointed by the Federal Court as the Federal Monitor, and he was charged with examining whether OPD has met its goals as outlined in the NSA. *Id.* ¶¶ 27-28. In 2014, Warshaw was also appointed the Compliance Director. *Id.* ¶ 27. The Compliance Director assists OPD with implementing reforms while working in concert with OPD to achieve common goals. *Id.* ¶ 28. Armstrong alleges that as of 2020, the City of Oakland, through its taxpayers, has paid $17.8 million in "monitor/compliance fees, related costs, and subject matter experts." *Id.* ¶ 29.

Despite the lengthy duration of the federal oversight, the Federal Monitor has repeatedly found OPD to not be in compliance with the NSA. *Id.* ¶ 48. Armstrong alleges that he led OPD to the closest it ever came to ending federal oversight. *Id.* ¶ 46. OPD entered a phase of federal oversight known as "sustainability"—a probationary period where the department has demonstrated that it has reached compliance and can continue to succeed. *Id.* Sustainability is the last phase of oversight before ending monitorship, which was scheduled to terminate in May 2023. *Id.*

However, on January 18, 2023, the Federal Monitor presented new findings in a Summary Report to the Federal Court. *Id.* ¶ 49. The Summary Report reported referenced three OPD Internal Affairs Division ("IAD") investigations. *Id.* ¶ 50. The first investigation, IAD Case No. 22-0858, involved a suspected hit-and-run incident in San Francisco involving OPD Sgt. Michael Chung while Chung was off-duty. *Id.* ¶ 51. The second investigation, IAD Case No. 22-0443, involved a suspected unreported discharge of a firearm in an OPD elevator by Chung. *Id.* The third investigation, IAD No. 22-1723, examined the OPD's process in responding to the first two incidents. *Id.* From these violations, the Summary Report concluded that Armstrong violated two

3

policies—"gross dereliction of duty" and "performance of duty"—by purportedly failing to properly supervise the hit-and-run investigation (No. 22-0858). *Id.* ¶ 53. The investigators did not conclude that Armstrong violated any policy in connection with the other two reports (No. 22-0443 and No. 22-1723). *Id.*

In response, on January 19, 2023, the City of Oakland Mayor Sheng Thao placed Armstrong on administrative leave. *Id.* ¶ 57. On January 23, 2023, Armstrong made public statements criticizing the Federal Monitor. *Id.* ¶ 61. Armstrong stated that the Federal Monitor was acting "in the interest of his own pocketbook by manufacturing a false crisis to justify extending his lucrative monitoring contract." *Id.* He further stated that the Monitor's conclusions were plainly inconsistent with the truth and the reports' own recitation of the facts, the Monitor had a financial motivation to levy such unfair criticisms to extend OPD's federal oversight and thus his monitorship, and the report was "a last ditch effort to destroy the credibility of [Armstrong], destroy the credibility of [the OPD], and to make the community believe that, again, OPD is involved in some shady business—and that's not what this is." *Id.*

On February 15, 2023, Mayor Thao held a press conference hours before the Police Commission was scheduled to hold its own meeting to discuss the Armstrong's status on leave. *Id.* ¶ 72. She announced that she decided to terminate Armstrong. *Id.* Mayor Thao stated that in her opinion OPD needed to "welcome opportunities for improvement rather than immediately reject[] criticism," and she elaborated further that "Armstrong made a number of statements that troubled me." *Id.* ¶ 79. She did not address any factual justification based on the details of the reports. *Id.* Rather, she emphasized her unwillingness to employ a Police Chief who disagreed with the Federal Monitor. *Id.* ¶ 81. Armstrong alleges that on other occasions Mayor Thao openly stated that she felt the Federal Monitor forced her to terminate Armstrong. *Id.* ¶ 83. Mayor Thao further declined to rehire Armstrong as the Police Chief of OPD. *Id.* ¶ 101.

## II. LEGAL STANDARD

### A. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." Fed. R. Civ. P.

4

12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B. Leave to Amend

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Proc. 15(a)(2). But courts have discretion to deny leave to amend because of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## III. DISCUSSION

### A. Judicial Notice

"The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Alternatively, the Court may "consider materials that are submitted with and attached to the Complaint. [The Court] may also consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011); *see also In re Diamond Foods, Inc. Sec. Litig.*, No. C 11–05386 WHA, 2012 WL 6000923, at *16 (N.D. Cal. Nov. 30, 2012) ("Under the incorporation by reference doctrine, a court may also consider documents submitted by defendants that were referenced in the complaint and whose authenticity has not been questioned.").

5

### 1. Defendants' Request for Judicial Notice

In connection with their Motion to Dismiss, Defendants seek judicial notice of four categories of documents: (1) relevant sections of Oakland's City Charter and municipal code; (2) pleadings from related court proceedings, including *Allen et al. v. City of Oakland et al*, 3:00-cv-4599-WHO (N.D. Cal) (the "Riders Case"); (3) Oakland's publicly available Salary Schedule Report; and (4) a limited number of documents and media incorporated by reference into Armstrong's Complaint. Armstrong opposes judicial notice of Exhibits C, D, E, F, G, H, J, and K. The Court takes judicial notice of exhibits A, B, and I. The Court takes judicial notice only of the existence of exhibits B, C, D, E, F, G, H, J, and K, and not for the truth of the matters contained in them.

Exhibit A consists of sections of the City of Oakland's City Charter relied upon in the corresponding Motion to Dismiss, including Article VI, sections 603, 604, and Article XII, section 1212. Exhibit B consists of sections of the City of Oakland's Municipal Code relied upon in the corresponding Motion to Dismiss, including the following sections: 2.24.100, 2.25.060, 2.29.020, 5.20.090, 5.26.050, 5.48.020, 5.52.060, 5.52.110, 5.58.050, 6.04.380, 8.04.030, 9.36.210, 10.08.010, 10.53, 12.44.120. State statutes, city charters, city codes, and county ordinances are all matters of public record within the category of "common knowledge" and are therefore proper subjects for judicial notice under Rule 201. *Rabkin v. Dean*, 856 F. Supp. 543, 546 (N.D. Cal. 1994) (citing *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977)). The Court takes judicial notice of these exhibits.

The following exhibits are docket entries from the Riders case. Exhibit C is a December 12, 2012 Order (Riders case, ECF 885) appointing a Compliance Director over the Oakland Police Department from the Riders case. Exhibit D is a February 14, 2014 Order (Riders case, ECF 973) appointing Monitor Robert Warshaw as the Compliance Director overseeing the Oakland Police Department in connection with the Riders case. Exhibit E is relevant excerpts of a transcript depicting statements made by Oakland officials at an April 27, 2022 case management conference in the Riders case (Riders case, ECF 1524). Exhibit F is a May 12, 2022 order in the Riders case placing the City into a sustainability period (Riders case, ECF 1525). Exhibit G is a January 18,

6

1    2023 order in the Riders case adopting and publishing the conclusions and recommendations on the
2    independent investigators (Riders case, ECF 1564). Exhibit H is an April 18, 2023 order in the
3    Riders case extending the sustainability period due to OPD's lack of achieving full compliance with
4    the NSA tasks (Riders case, ECF 1585). Armstrong argues that the Court should not judicially notice
5    these documents because truth of what is in those documents is subject to reasonable dispute.
6    However, Defendants seek judicial notice of the existence of the pleadings, and not for the
7    underlying truth of any factual matter in the case file. The Court therefore takes judicial notice only
8    of the existence of these exhibits.

9    Exhibit I is excerpts of the City of Oakland's Salary Schedule, which can be obtained by any
10   member of the public. Defendants seek judicial notice of the current salary range of the Chief of
11   Police position and its relative position compared to other City positions (i.e., receiving higher
12   compensation than other public servants). Because this is a matter of public record not reasonably
13   subject to dispute, the Court takes judicial notice of this exhibit.

14   Exhibit J is a January 24, 2023 Fox2, KTVU news article titled, "NAACP rallies behind
15   Oakland police chief placed on administrative leave," cited by Armstrong in footnote 14 of the
16   Complaint. Exhibit K is a YouTube video posted by CBS News Bay Area, KPIX titled "Raw:
17   Oakland Mayor Sheng Thao announces firing of OPD Chief LeRonne Armstrong" and cited by
18   Armstrong in footnote 15 of the Complaint. Armstrong asserts that these exhibits are hearsay, and
19   the Complaint did not reference these news articles for the truth of the matters contained in them.
20   Instead, they were referenced only for the fact that such articles and media attention existed.
21   Defendants claim that these documents are central to Armstrong's claims in that they support the
22   statements he made to the public about his administrative leave and the federal monitor, demonstrate
23   public activism connected to his statements, and evidence Mayor Thao's explanation of her decision
24   to terminate Armstrong from the Police Chief position. Because the truth of the content of these
25   exhibits is in dispute, the Court takes judicial notice only of the existence of these exhibits and not
26   for the truth of the matters contained in them.

27   //
28   //

**2. Armstrong's Request for Judicial Notice**

In connection with his Opposition, Armstrong seeks judicial notice of: (1) a pleading from *Negrete et al v. City of Oakland, et al.*, 3:19-cv-05742-WHO (N.D. Cal.) (Exhibit A) ("*Negrete*"), and (2) relevant sections of Oakland's municipal code (Exhibits B and C). The Court takes judicial notice of exhibits B and C. The Court takes judicial notice only of the existence of exhibit A.

Exhibit A is the City of Oakland and Police Commission's Motion for Judgment on the Pleadings in *Negrete*. Armstrong seeks judicial notice of the motion, not for the truth of the words, but in support of their policymaker exception argument. The Court takes judicial notice only of the existence of this exhibit.

Exhibit B is Sections 2.25.020 and 2.25.060 of the City of Oakland's Municipal Code. Exhibit C is Section 2.24.100 of the City of Oakland's Municipal Code. As mentioned previously, State statutes, city charters, city codes, and county ordinances are all matters of public record within the category of "common knowledge" and are therefore proper subjects for judicial notice under Rule 201. *Rabkin*, 856 F. Supp. at 546. The Court takes judicial notice of these exhibits.

**B. Policymaker Exception**

Defendants contend that Armstrong, as the Oakland Police Chief, was a policymaker who could be terminated for political reasons without violating the First Amendment.

The First Amendment rights of government employees are not absolute. When analyzing claims by government employees who are asserting that they were fired because they exercised their First Amendment rights, the Court must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). However, the Supreme Court has carved out an exception for employees in "policymaking positions." *Elrod v. Burns*, 427 U.S. 347, 372 (1976). "[A] public official who is a 'policymaker' may be fired for political reasons without offending the United States Constitution." *Fazio v. City & Cnty. of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (citing *Elrod*, 427 U.S. at 372).

8

The Ninth Circuit has set forth "[s]ome factors to be considered when determining whether a job is a policymaking position," including "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Id.* at 1334 n.5 ("*Fazio* factors"). Another factor considered by the Ninth Circuit is whether the employee actively sought to undermine the employer's policies. *Bardzik v. Cnty. of Orange*, 635 F.3d 1138, 1148 (9th Cir. 2011) ("*Bardzik* factor").

These factors are intended to guide the "policymaker" analysis, but not supplant "the essential inquiry"—whether political "affiliation is an appropriate requirement for the effective performance of the public office involved." *Hunt v. Cnty. of Orange*, 672 F.3d 606, 613 (9th Cir. 2012) (quoting *Fazio*, 125 F.3d at 1331). "'Political affiliation' is broader than 'party membership' in that it includes 'commonality of political purpose and support.'" *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 996 (9th Cir. 1999) (quoting *Collins v. Voinovich*, 150 F.3d 575, 577 (6th Cir. 1998)).

### 1. The Policymaker Determination can be Made at this Stage.

As an initial matter, Armstrong maintains that the policymaker determination is premature to resolve at the pleading stage. Because the policymaker inquiry can be "highly fact-specific," Armstrong contends that the Court should conduct the policymaker analysis at a later stage in the proceedings. Armstrong provides several cases in support of this contention, but none of these cases posit such a bright-line rule. Further, none of these cases are controlling authority, or even from this District. *See* Mot. at 3-4.

Defendants argue that the Ninth Circuit has held that the "policymaker" determinations can be made on a motion to dismiss, especially where relevant statutes also support that conclusion. In *Lathus*, the Ninth Circuit upheld the dismissal of a First Amendment retaliation claim where the plaintiff, a former Citizen Participation Advisory Board member appointed by a city council member, was removed from the Board. *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1241 (9th Cir. 2023). On appeal from the motion to dismiss stage, the Ninth Circuit conducted a policymaker determination by referencing relevant local municipal codes. *Id.*

While the Court agrees with Armstrong that the policymaker determination may be a highly fact-specific inquiry, here, the Court finds that it may conduct the analysis by referencing the Complaint and judicially noticed exhibits.

### 2. Armstrong was a Policymaker who was Terminated for Political Reasons.

Defendants claim that Armstrong was a policymaker who could be terminated for political reasons without violating the First Amendment. First, Defendants argue that the *Fazio* factors and the *Bardzik* factor, when accounting for relevant statutes, reveal that the Oakland Chief of Police is a policymaker. Second, Defendants argue that Armstrong's termination was motivated by local political considerations which fall within the reach of the policymaker exception.

Armstrong's opposition cautions the Court to not draw a clear line in finding the Police Chief to be a policymaker. *See* Opp'n at 5-7. But there is no clear line rule in the Court's policymaker analysis. Rather, the thorough application of the *Fazio* factors and the *Bardzik* factor will guide the Court's determination. For the reasons stated below, Defendant's motion to dismiss the 42 U.S.C. Section 1983 claim for retaliation in violation of the First Amendment against both Defendants is **GRANTED** with prejudice.

#### a. *Fazio* Factors and *Bardzik* Factor Support the Finding that Armstrong was a Policymaker.

Defendants assert that the *Fazio* factors point to the conclusion that Armstrong was a policymaker. The *Fazio* factors include (1) vague or broad responsibilities, (2) relative pay, (3) technical competence, (4) power to control others, (5) authority to speak in the name of policymakers, (6) public perception, (7) influence on programs, (8) contact with elected officials, and (9) responsiveness to partisan politics and political leaders. *Fazio*, 125 F.3d at 1334 n.5.

Defendants first turn to (1) vague or broad responsibilities, (3) technical expertise, (4) power to control others, and (7) influence on OPD programs. Defendants contend the Complaint describes Armstrong's own influence at OPD and in the community at large; his management of OPD's "day-to-day operations"; his "strong record of implementing reforms and demonstrating a commitment to progressive policing that prioritizes accountability;" his reputation as "an effective reformer by bringing OPD to the brink of ending federal oversight;" how he "built a reputation and track record

10

as an effective internal reformer who was committed to improving [OPD] . . . through cultural and institutional change;" his leadership of the Stop-Data Collection Project; and his service as OPD's liaison to the Stanford University police-reform SPARQ Program, leading the "implementation of all 50 recommendations resulting from the research." Compl. ¶¶ 104, 6, 22, 23.

Armstrong argues that Defendants conflate several factors and misconstrue the allegations. However, the Court finds this contention to be unpersuasive. While the *Fazio* factors contain some overlap, the allegations in the Complaint outlined by Defendants do go to whether Armstrong was a policymaker. Armstrong next asserts that no allegations in the Complaint regarding the Chief's authority to speak "in the name of other policymakers." *Bardzik*, 635 F.3d at 1146. Defendants claim that this case is distinguishable from the plaintiff lieutenant in *Bardzik*, because here, there is no higher policymaker in the OPD, and thus no one else Armstrong could speak "on behalf of." *Id.*

As to (3) technical expertise, Defendants note that Armstrong explained that OPD needed a Chief of Police with a background as a "reformer" because the Chief would be critical to implement NSA reforms—indicating broad and vague duties and the power to affect change to OPD policies, procedures, and programs. *Id.* ¶ 24. The Complaint describes Armstrong's qualifications and expertise in policing by pointing to his rise "through the ranks" and his educational background and extensive training with the Commission on Peace Officer Standards and Training ("POST") and the FBI National Academy. *Id.* ¶¶ 6, 21. In response, Armstrong concedes this factor. Opp'n at 8.

As to (2) relative pay, Defendants claim that the Chief is compensated far and above any other police department employee. Chief of Police's maximum compensation is $28,186.75 per month while Deputy Chiefs are paid $23,332.28 per month, and Police Captains $18,594.84 per month. Defs.' RJN, Ex. I. Armstrong argues that Defendants do not compare the Chief's pay to any policymakers such as the City Administrator which is paid a maximum salary of $35,244 monthly. Defs.' RJN, Ex. I. Defendants counter that Armstrong was the most highly compensated member of the OPD.

As to (5) authority to speak on behalf of the agency and (6) public perception, Defendants contend that the Complaint makes clear that the Police Chief regularly speaks on behalf of the Department. *See, e.g.*, Compl. ¶¶ 6, 21–23; *see also* Defs.' RJN, Ex. E at 9–19 (Chief speaking to

11

1  NSA court on behalf of the Department). Members of the public including community and political
2  leaders pay close attention to who fills the role of Chief. Compl. ¶¶ 72–75.

3  Defendants assert that the state and local laws judicial noticed by this Court also indicate the Chief's (1) broad responsibilities and power and (9) responsiveness to partisan politics and political leaders. The Oakland City Municipal Code provides that the "management and operation" of the Police Department is "the responsibility of the Chief of Police, who shall serve as Director" of the Police Department. Defs.' RJN, Ex. B, Section 2.29.020. Further, several Oakland municipal code provisions delegate broad, discretionary authority to the Chief of Police. *See* Defs.' RJN, Ex. B, chapter 10.53 (delegating to Chief of Police "all powers" related to load transportation permits, including administering rules and regulations); section 9.36.210 (Chief of Police makes determinations concerning certain types of firearms); section 5.52.110 (empowering Chief of Police to file complaints with Bureau of Consumer Affairs related to private security "whenever they believe good cause exists therefor"); section 5.58.050 (empowering Chief of Police to supervise and regulate school stores); section 5.26.050 (authorizing Chief of Police to conduct investigation and issue ammunition permits); section 10.08.010 (authority to designate head of Police Department Traffic Division); section 5.48.020 (authority to issue permit to solicit or peddle); chapter 12.44.120 (authority to issue parade permits); section 5.52.060 (Chief of Police authorized to determine and issue private guard permits); section 6.04.380 (Chief of Police has power to adopt rules and regulations concerning animal control); section 8.04.030 (Chief of Police authorized to administer and enforce physical security requirements for commercial buildings); section 5.20.090 (Chief of Police authorized to make "rules and regulations" for close-out sales that, in their "opinion," will prevent deception and protect the public).

Defendants further argue that for (9) responsiveness to partisan politics and political leaders, the Chief is uniquely exposed to political forces. The City's Charter provides the mayor with the clear authority to terminate the Chief of Police with or without cause. Defs.' RJN, Ex. A, Article VI, § 604(b)(10). The Chief of Police—unlike other sworn officers—may be removed from their position by the Police Commission, a citizen oversight entity, under certain circumstances. *Id.* The

California legislature also provides that the Chief may be removed for political reasons such as a "result of a change in administration." Cal. Gov't Code § 3304(c).

Armstrong argues that Defendants have not shown that (8) contact with elected officials weighs in favor of finding him a policymaker. The Complaint contains no allegations concerning the Chief's contact with the Mayor except as related to his constitutionally protected activity. In response, Defendants counter that Armstrong spoke with the Mayor about the IAD investigations, and that the Mayor decided to place Armstrong on administrative leave, reveal that the police chief is in contact with, and responsive to, political leaders. Compl. ¶¶ 56–57. Similarly, the Mayor's press conference announcing her decision to terminate Armstrong speaks to *Fazio* factors concerning public perception and political leadership. *Id.* ¶ 76.

In addition to the *Fazio* factors, Defendants claim that Armstrong actively sought to undermine Mayor Thao's policies. In *Bardzik*, the court recognized an additional factor that was persuasive in the policymaker analysis: whether the employee actively sought to undermine the employer's policies. *Bardzik*, 635 F.3d at 1148. In *Bardzik*, plaintiff was a lieutenant in the Orange County Sheriff's Department under the command of defendant Sheriff. *Id.* at 1140. The court found that the plaintiff took away badges from the Sheriff's political allies when he was told not to by the Sheriff; he sent a memo regarding the legal propriety of campaign solicitation without consulting the Sheriff; and he openly criticized the Sheriff's decisions as unethical on- and off-duty. *Id.* at 1149. Weighing the fact that the plaintiff actively sought to undermine the Sheriff's policies, the court found that the plaintiff was a policymaker. *Id.*

Here, Defendants argue that, like in *Bardzik*, Armstrong's speech undercut Mayor Thao's agenda—her "absolute requirement" that anyone in her administration be able to work closely with the Federal Monitor. Compl. ¶ 81. By criticizing the Federal Monitor, with "extensive" news coverage of those criticisms, and stating that the Federal Monitor was attempting to "extend his lucrative monitoring contract," Armstrong was undermining the ability of Mayor Thao's administration to work with the monitor assigned by the Court to oversee OPD. *Id.* ¶¶ 114, 73.

1    Defendants' arguments are persuasive. When viewed in totality, the *Fazio* factors and the

2    *Bardzik* factor weigh in favor of finding that Armstrong was a policymaker who could be

3    determination for political reasons. The Court finds that Armstrong was a policymaker.

### b. Armstrong was Terminated for Political Reasons.

Defendants claim that Armstrong's termination was for "political reasons" which fall within the policymaker exception. *Fazio*, 125 F.3d at 1331. Defendants assert that "political," in the context of the policymaker exception, extends into contexts where governance considerations are an important component of the public employee's job duties or where their speech relates to internal policies that the public has an interest in monitoring.

Defendants cite to *Biggs v. Best, Best & Krieger*. In *Biggs*, an attorney was fired from her position with a private law firm that performed the services of city attorney. *Biggs*, 189 F.3d at 992. The city terminated the attorney due to her family's role in seeking the recall of the city mayor which conflicted with her work for the city. *Id.* at 996. Under a qualified immunity review, the court found that, even though the attorney was in a nonpartisan role, her speech was an important part of her position because the city council needed to trust its contract attorneys. *Id.* The court held that the attorney was a policymaker who was terminated for political reasons. *Id.* at 997.

Defendants also cite to Sixth Circuit case of *Rose v. Stephens*. In *Rose*, a state police commissioner was terminated for an internal memo he circulated which eliminated the position of deputy commissioner and demoted the current deputy commissioner. *Rose v. Stephens*, 291 F.3d 917, 919 (6th Cir. 2002). The demoted deputy commissioner had been recently promoted to the position on request of the state governor. *Id.* The Court determined that the commissioner was a policymaker who was terminated for political or policy-related issues. *Id.* at 925. Thus, the Court held that the commissioner's speech was not protected by the First Amendment. *Id.*

Defendants claim that, like the plaintiffs in *Biggs* and *Rose*, Armstrong was terminated for his public comments which touched on police reform, municipal spending, and federal oversight. The Complaint highlights local interest in these issues: Armstrong's January 23 speech in which he "openly criticized Warshaw" was "widely reported and recorded" by the media. Compl. ¶¶ 58, 61. Armstrong's comments covered police reform, including that the Federal Monitor's conclusion had

14

"mis[led] the community into believ[ing] this was the 'same old Oakland Police Department" and that Armstrong himself had a "commitment to leading the effort" to address problems at OPD. *Id.* ¶¶ 62d, 63. However, Mayor Thao understood Armstrong's words to reveal a "lack of commitment of accountability and reform at OPD." *Id.* ¶ 80. Thus, she terminated him for political reasons.

Armstrong claims that no facts show that his speech or beliefs would interfere with the discharge of his duties or that they were at odds with the purpose of his role. He was committed to serving the public safety needs of the Oakland community, to respecting and collaborating with Oakland's citizens, businesses, and community members, and to employing high standards of policing. Armstrong further argues that are no facts that show his speech or beliefs were at odds with Mayor Thao's administration or her goals or that the Chief was not loyal to the City of Oakland, Mayor Thao, or her administration.

The Court does not doubt Armstrong's commitment to his community. Armstrong was even commended by the Federal Monitor in April 2022 for his commitment to ensuring the tasks of the NSA were met. Compl. ¶ 47. However, Mayor Thao believed that Armstrong's vision of police reform, as expressed through his public comments, was at odds with her own.[1] The Court does not find that this application of the policymaker exception extends the exception further than the Supreme Court intended. The Court finds that Armstrong was a policymaker who was terminated for "political reasons." *Fazio*, 125 F.3d at 1331.

### 3. Leave to Amend is Futile.

The Court acknowledges that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. Proc. 15(a)(2). However, here, amendment would be futile. Armstrong cannot amend the Complaint in any way that would alter the finding that Armstrong was a policymaker who was be terminated for political reasons by Mayor Thao. The motion to dismiss the 42 U.S.C. Section

---

[1] It does not escape the Court's attention that the Complaint contains allegations that Mayor Thao, stated that she felt that the Federal Monitor forced her to terminate Armstrong. Compl. ¶ 83. Specifically, the Complaint alleges that Mayor Thao stated to a small group of city staff, "F—k the Monitor for making me do this. I really didn't want to do this." *Id.* These allegations suggest that Mayor Thao's motivations for terminating Armstrong may not have been *solely* for her publicly stated political reasons. However, the *cited* caselaw does not suggest that this fact would alter the Court's analysis. Consequently, precluding leave to amend.

1983 claim for retaliation in violation of the First Amendment against both Defendants is **GRANTED** with prejudice.

### C. Qualified Immunity

Because the Court finds that Armstrong was a policymaker who was terminated for political reasons, the Court need not address the question of whether Mayor Thao is entitled to qualified immunity for her actions. However, even if Defendants had not argued that Armstrong was subject to the policymaker exception, the qualified immunity analysis would also involve determining whether the policymaker exception applies here. *See Bardzik*, 635 F.3d at 1141 (finding that defendant was entitled to qualified immunity for retaliating against plaintiff when plaintiff was in a policymaking position); *Biggs*, 189 F.3d at 997 (same).

Armstrong urges the Court to consider *Coszalter v. City of Salem*, 320 F.3d 968, 979 (9th Cir. 2003). *See* ECF 35. Armstrong argues that this case stands for the proposition that the right to be free from first amendment retaliation is "clearly defined" and "well established" and has been since at least 1984. *Coszalter*, 320 F.3d at 979. This case involved three plaintiffs who were members of the "main line crew" of the Sewer Division of the Public Works Department. *Id.* at 970. The court did not apply the policymaker exception analysis to these employees and instead applied the *Pickering* test. *Id.* at 973. Because the *Coszalter* court did not apply the policymaker exception, this case is distinguishable from the instant case.

### D. Remanding the State-Based Labor Code Section 11.02.5 Retaliation Claim for Lack of Subject Matter Jurisdiction.

"Federal courts are courts of limited jurisdiction . . . ." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citing *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) (internal quotation marks omitted)). For federal subject matter jurisdiction to exist, a case must either involve diversity of citizenship between the parties or involve a claim arising under federal law. *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183 n.2 (9th Cir. 2002); 28 U.S.C. §§ 1331-32. Courts have a duty to consider its subject matter jurisdiction *sua sponte*. Fed. R. Civ. P. 12(h)(3); *see Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). After removal, if the federal court finds at any

1 stage of the proceeding that it does not have jurisdiction, then the case shall be remanded. 28 U.S.C. § 1447(c); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

Defendants filed notice of removal based on federal question jurisdiction and supplemental jurisdiction. *See* ECF 1. Federal question jurisdiction under 28 U.S.C. § 1331 requires a civil action to arise under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331. Here, the Court has granted the motion to dismiss Armstrong's First Amendment claim which was the basis for federal question jurisdiction. *See supra* Section III.B.2. As for the remaining state-based Labor Code Section 11.02.5 Retaliation Claim, the Court exercised supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). The Court will now consider whether to use its discretion to decline supplemental jurisdiction.

Under 28 U.S.C. 1367(c), a district court may decline to exercise supplemental jurisdiction over a state law claim if it has dismissed all claims over which it has original jurisdiction. In supplemental briefing, Defendants urge the Court to continue exercising supplemental jurisdiction. Defendants contend that if the state claim is remanded to state court while the Ninth Circuit (or this Court on remand) continues to exercise jurisdiction over the First Amendment claim, two different court systems would be addressing the same factual issue and the same alleged harm. ECF 40. However, the Court finds this risk to be speculative. The Court finds that the state claim should be remanded to state court for adjudication. Accordingly, the Court hereby **REMANDS** the remaining state-based claim for lack of subject matter jurisdiction.

## IV. CONCLUSION

After review and consideration of the motion, the briefings, and all attachments and exhibits thereto, the Court finds that Armstrong's termination falls within the policymaker exception established by the Supreme Court in *Elrod v. Burns*, 427 U.S. 347 (1976).

The Court **GRANTS** with prejudice Defendants' motion to dismiss Armstrong's First Amendment claim.

The Court **REMANDS** Armstrong's remaining state-based Labor Code Section 11.02.5 Retaliation Claim to state court (Alameda County Superior Court Docket: 24CV062749) for lack of subject matter jurisdiction.

The Clerk of the Court shall provide the receiving court with a certified copy of docket entries and a certified copy of this Order.

This Order resolves ECF 13.

**IT IS SO ORDERED.**

Dated: November 6, 2024

TRINA L. THOMPSON
United States District Judge

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.

ATTEST:
MARK B. BUSBY
Clerk, U.S. District Court
Northern District of California

by: Susie F. Barrera
Deputy Clerk
Date: 11/8/2024